**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

OBIORA E. EGBUNA,
<u>Plaintiff-Appellant,</u>

v.

TIME-LIFE LIBRARIES, INCORPORATED,

No. 95-2547

<u>Defendant-Appellee.</u>

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
<u>Amicus-Curiae.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-95-197)

Argued: March 4, 1997

Decided: August 19, 1998

Before WILKINSON, Chief Judge, RUSSELL, WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, and
HALL, Senior Circuit Judge.*

_____

Affirmed by published per curiam opinion, in which Chief Judge Wil-
kinson, Judge Widener, Judge Wilkins, Judge Niemeyer, Judge Ham-

_____

*The opinion in this case was prepared by Circuit Judge Donald S.
Russell. Judge Russell died prior to the time the decision was filed. The
remaining members of the court majority continue to concur in his opin-
ion.

ilton, Judge Luttig, Judge Williams, and Senior Judge Hall joined. Judge Ervin wrote a dissenting opinion, in which Judge Murnaghan, Judge Michael, and Judge Motz joined.

---

**COUNSEL**

**ARGUED:** John P. Racin, WEISSBRODT, RACIN & MIELKE, Washington, D.C., for Appellant. Paul D. Ramshaw, Appellate Services Division, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. Donald R. Livingston, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Nina J. Ginsberg, DIMURO, GINSBERG & LIEBERMAN, P.C., Alexandria, Virginia, for Appellant. C. Gregory Stewart, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, Samuel A. Marcosson, Office of General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. Lawrence D. Levien, Neil J. Welch, Jr., Harry J. F. Korrell, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appellee.

---

**OPINION**

PER CURIAM:

Obiora E. Egbuna brought this employment discrimination action against his former employer, Time-Life Libraries Inc. ("TLLI"), alleging that TLLI refused to rehire him in retaliation for his having participated in another employee's discrimination suit against TLLI. The district court granted summary judgment to TLLI finding that Egbuna had not established a prima facie case of employment discrimination. A panel of our circuit reversed the district court's ruling. Before the case was remanded to the district court, however, a majority of this court granted a rehearing en banc. This decision follows.

2

I.

TLLI hired Egbuna, a Nigerian national, in June 1989. When TLLI hired Egbuna, he possessed a valid student work visa issued by the Immigration and Naturalization Service ("INS"). Although Egbuna's work visa expired six months after he was hired, TLLI apparently failed to note that it had expired, and Egbuna continued to work for TLLI until April 1993.[1]

During Egbuna's employment with TLLI, a subordinate of Egbuna, Harrison Jackson, told Egbuna that he had been sexually harassed by a supervisory employee. Egbuna failed to report these complaints to higher management, or to TLLI's Human Resources Department, in violation of company policy. But when TLLI investigated Jackson's allegations, after Jackson filed a charge of discrimination against TLLI with the Equal Employment Opportunity Council alleging that he had been the victim of unlawful sexual harassment in the work-place, Egbuna corroborated many of Jackson's allegations.

In April 1993, Egbuna voluntarily resigned from TLLI because he intended to return to Nigeria. When his plans changed, he approached TLLI in June 1993 about reemployment. At that time, Egbuna was still unauthorized to work in the United States, because he had never attempted to renew his visa.[2] On the twenty-first of July, TLLI informed Egbuna that he would not be hired.

Contending that TLLI had extended him an employment offer on July nineteenth and withdrew the offer on the twenty-first because Egbuna had corroborated many of Jackson's allegations of sexual harassment, Egbuna sued TLLI for violating section 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Section 2000e-3 provides that discrimination by an employer against an employee or applicant for employment who has participated in a Title

─────────────────────────────

[1] The record reveals that TLLI's hiring policy was to refuse uniformly to hire prospective alien employees who fail to produce valid identification and proof of authorization for employment.

[2] Egbuna's deposition reveals that he never attempted to renew his visa because he feared deportation and did not want to alert the authorities of his illegal immigration status.

VII investigation, proceeding, or hearing constitutes an unlawful employment practice.

TLLI moved for summary judgment on the grounds that it never made Egbuna an offer on July 19, 1993, and that even if TLLI had extended an offer to Egbuna, TLLI could not have employed him because of his undocumented alien status. The district court granted TLLI's motion. Relying on McDonnell Douglas Corp. v. Green,**3** the district court found that Egbuna could not demonstrate that he was a victim of discrimination, because at the time he sought employment, Egbuna was unqualified for the position he sought by virtue of his failure to possess legal documentation authorizing him (an alien) to work in the United States.**4**

II.

We review the grant of summary judgment de novo .**5** TLLI is entitled to summary judgment if there is no genuine issue of material fact for trial and TLLI is entitled to summary judgment as a matter of law.**6** To be successful in its motion for summary judgment, TLLI must show the absence of evidence to support Egbuna's case.**7** Conversely, to defeat TLLI's motion, Egbuna must demonstrate the existence of a genuine trial issue of fact without relying upon mere allegations or denials of his pleading.**8** We may affirm the grant of summary judgment on grounds other than those relied upon by the district court.**9**

_____

**3** 411 U.S. 792 (1973).
**4** Egbuna was eventually granted temporary work authorization in January 1994, in connection with his application for political asylum. Thus, from December 1989 through January 1994, Egbuna was unemployable in the United States.
**5** **Nguyen v. CNA Corp.**, 44 F.3d 234, 236 (4th Cir. 1995).
**6** Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).
**7** **Shaw v. Stroud**, 13 F.3d 791, 798 (4th Cir. 1994).

**8** **Anderson v. Liberty Lobby, Inc.** , 477 U.S. 242, 248 (1986). See also Shaw, 13 F.3d at 798 ("A mere scintilla of evidence supporting the case is insufficient.").
**9** **Keller v. Prince George's County**, 923 F.2d 30, 32 (4th Cir. 1991).

4

Allegedly TLLI offered Egbuna a job in July 1993 and then rescinded its offer two days later because Egbuna had participated in Jackson's suit against TLLI.**10** Egbuna maintains these facts present a classic case of retaliation. We find, however, that Egbuna has no cause of action because his undocumented status rendered him ineligible both for the remedies he seeks and for employment within the United States.

Pursuant to Title VII, a plaintiff may seek equitable remedies from the courts for the discriminatory employment practices of an employer.**11** The remedies include the hiring of the applicant, reinstatement, back pay, and injunctions against further violations. **12** The goal of awarding these equitable remedies is to make the complainant whole without imposing large monetary penalties upon the employer. **13**

A plaintiff is entitled to the above remedies only upon a successful showing that the applicant was qualified for employment. When the applicant is an alien, being "qualified" for the position is not determined by the applicant's capacity to perform the job-- rather, it is determined by whether the applicant was an alien authorized for employment in the United States at the time in question. Congress so declared in the Immigration Reform and Control Act of 1986 ("IRCA"), which was enacted to reduce the influx of illegal immigrants into the United States by eliminating the job magnet.**14** IRCA declares it unlawful for employers to employ, recruit, or refer for a fee all unauthorized aliens.**15** IRCA identifies unauthorized aliens as

_____

**10** Conspicuously, the individual who allegedly made the offer and revocation of employment, and who indicated TLLI did not hire Egbuna for retaliatory reasons, was neither deposed by Egbuna nor named on his witness lists.

**11** 42 U.S.C.A. § 2000e-5(g) (1994).

**12 Id.**

**13 Albemarle Paper Co. v. Moody,** 422 U.S. 405 (1975) (Title VII remedies serve to restore the complainant to the position he would have been in absent the discrimination).

**14** Statement by President Ronald Reagan Upon Signing S. 1200, 22 Weekly Comp.Pres.Doc. 1534, (Nov. 10, 1986).

**15** 8 U.S.C.A. § 1324a (West Supp. 1997).

those individuals who at the particular time relating to employment are aliens neither lawfully admitted for permanent residence, nor authorized to be so employed by IRCA or by the Attorney General.[16]

To ensure, therefore, that employers do not hire unauthorized aliens, IRCA mandates that employers verify the identity and eligibility to work of each new-hire by examining specified documents before they begin work.[17] If an alien applicant is unable to present the required documentation, the unauthorized alien cannot be hired.[18] Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status.[19] IRCA specifically states:

> It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.[20]

Employers who violate IRCA are punished not only by a series of civil fines,[21] but are also subject to criminal penalties of up to $3,000 for each unauthorized alien so employed, and/or imprisonment for not more than six months for a pattern or practice of such violations.[22] IRCA thus statutorily disqualifies any undocumented alien from being employed as a matter of law.

Regardless of the fact that IRCA proscribes the relationship between an unauthorized alien and an employer, Egbuna cites Sure-Tan, Inc. v. NLRB,[23] to support his contention that Title VII protects

_____

**16** **Id.** § 1324a(h)(3).
**17** **Id.** § 1324a(b).
**18** **Id.** § 1324a(a)(1).
**19** **Id.** § 1324a(a)(2).
**20** **Id.**
**21** **Id.** § 1324a(e)(4).
**22** **Id.** § 1324a(f)(1).
**23** 467 U.S. 883 (1984).

unauthorized aliens from employment discrimination occurring during the hiring process. Sure-Tan, a National Labor Relations Act ("NLRA") case which extended NLRA protection to illegal alien employees, is inapplicable to the case at hand for three reasons. First, Sure-Tan, is not a case in which the alleged discrimination occurs during the hiring process. The unauthorized aliens in Sure-Tan experienced discrimination after they were hired and while they were employees of Sure-Tan. Second, Sure-Tan is a pre-IRCA case which reasons that because "the employment relationship between an employer and an undocumented alien is . . . not illegal under the [Immigration and Nationality Act ("INA")], there is no reason to conclude that application of the NLRA to employment practices affecting such aliens would necessarily conflict with the terms of the INA."[24] Third, IRCA effected a monumental change in our country's immigration policy by criminalizing the hiring of unauthorized aliens.

Given Congress' unequivocal declaration that it is illegal to hire unauthorized aliens and its mandate that employers immediately discharge unauthorized aliens upon discovering their undocumented status, we cannot reverse the district court's grant of summary judgment in favor of TLLI. To do so would sanction the formation of a statutorily declared illegal relationship, expose TLLI to civil and criminal penalties, and illogically create an entitlement simply because Egbuna applied for a job despite his illegal presence in this country and despite his having been statutorily disqualified from employment in the United States. In this instance, to rule Egbuna was entitled to the position he sought and to order TLLI to hire an undocumented alien would nullify IRCA, which declares it illegal to hire or to continue to employ unauthorized aliens.

III.

For the foregoing reasons, we affirm the district court's grant of summary judgment.

AFFIRMED
_____

**24** <u>Id.</u> at 893.

7

ERVIN, Circuit Judge, dissenting:

Because of the procedural posture of the case, we must assume that TLLI refused to hire Egbuna in retaliation for his participation in a co-worker's Title VII action and that TLLI, when it engaged in its retaliation, was unaware that Egbuna was without authorization to work in this country. The question, then, is whether an undocumented alien can ever prove a prima facie case of employment discrimination. Perceiving a conflict between IRCA's proscription of hiring undocumented aliens and federal employment discrimination statutes, the majority holds that employers cannot be held accountable under Title VII for adverse employment actions taken against undocumented aliens. For a number of reasons, the majority's analysis is misguided.

First, there is no conflict between IRCA and Title VII. Nothing in IRCA suggests that Congress intended to limit the rights of undocumented aliens under federal labor and anti-discrimination laws. To the contrary, the legislative history explicitly cautions that IRCA should not be interpreted as extinguishing an undocumented alien's rights under these statutes:

> [T]he committee does not intend that any provision of this Act would limit the powers of State or Federal labor standards agencies such as the . . . Equal Employment Opportunity Commission . . . to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies.

House Comm. on Educ. and Labor, H.R. Rep. No. 99-682(II), at 8-9 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5758.[1] Because Egbuna

_____

[1] This understanding of IRCA is echoed in the report for the House Committee on the Judiciary. See H.R. Rep. No. 99-682(I), at 58 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5662 ("It is not the intention of the Committee that the employer sanctions provision of the bill be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing law.").

8

was denied employment in retaliation for "engaging in activities protected by [the EEOC]," see id., I think it obvious, as a matter of congressional intent, that IRCA does not operate as a bar to Egbuna's claim.

Second, the majority's opinion defeats Congress's desire to eradicate employment discrimination in which an employer retaliates against an employee, or former employee, for participating in a Title VII investigation. The pertinent question in anti-discrimination cases is whether the employer was motivated by a discriminatory animus at the time of the adverse employment action against the employee. This is the clear holding of a unanimous Supreme Court in McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352 (1995). McKennon held that after-acquired evidence of a legitimate basis for an employee's termination could not shield an employer from liability under the Age Discrimination in Employment Act ("ADEA"). **2** The Court found that after-acquired evidence was relevant only to the question of the remedy to which the employee was entitled. Id. at 360-62. The Court's decision was based on the value of effectuating the purpose of the ADEA: "the elimination of discrimination in the workplace." Id. at 358. "The disclosure through litigation of incidents or practices which violate national policies respecting nondiscrimination in the work force is itself important . . . . The efficacy of[the ADEA's] enforcement mechanisms becomes one measure of the success of the Act." Id. at 358-59. Following the Court's reasoning in McKennon, TLLI should be held liable if it is found to have retaliated against Egbuna in violation of Title VII. The question of Egbuna's work authorization is one that is pertinent only to the remedy to which he may be entitled, and not to whether TLLI acted with discriminatory animus in its employment decision making.

Third, as the Eleventh Circuit observed in the context of the Fair Labor Standards Act ("FLSA"), enforcement of federal employment laws actually reinforces and strengthens laws, such as IRCA, that aim to stop illegal immigration. See Patel v. Quality Inn South, 846 F.2d 700 (11th Cir. 1988).

_____

**2** Analysis of the McDonnell Douglas burden-shifting scheme in ADEA cases applies with equal force to claims under Title VII. Gillins v. Berkeley Elec. Coop. Inc., 1998 WL 381092, at *3 n.* (4th Cir. July 9, 1998).

9

> If the FLSA did not cover undocumented aliens, employers would have an <u>incentive</u> to hire them. Employers might find it economically advantageous to hire and underpay undocumented workers and run the risk of sanctions under the IRCA. . . . By reducing the incentive to hire such workers the FLSA's coverage of undocumented aliens helps discourage illegal immigration and is thus fully consistent with the objectives of the IRCA.

<u>Id.</u> at 704-05. The majority's decision, in effect, relieves employers of their obligation to comply with federal employment laws, other than penalties under IRCA, with regard to any undocumented workers they might employ. This interpretation of IRCA may provide an employer with an economic incentive to hire undocumented workers and, therefore, not only fails to effectuate the anti-discrimination provisions of Title VII, but also works <u>against</u> IRCA's goal of curtailing illegal immigration.**3**

Finally, the majority's decision presumably reaches beyond Title VII and extinguishes an undocumented alien's rights under the ADEA and the Americans with Disabilities Act, both of which require that an employee be "qualified" in order to hold an employer liable for unlawful discrimination. <u>See Henson v. Liggett Group, Inc.</u>, 61 F.3d 270, 274 (4th Cir. 1995) (requiring that applicant prove "she was <u>qualified</u> for a job" as part of the ADEA prima facie case) (emphasis added); 42 U.S.C. § 12112(a) (1994) (providing that "[n]o covered entity shall discriminate against a <u>qualified</u> individual with a disability") (emphasis added). Under the majority's reasoning, I assume that undocumented aliens are also no longer considered to be "employees" for purposes of the National Labor Relations Act ("NLRA") and the FLSA since the majority holds that IRCA "statutorily disqualifies any undocumented alien from being <u>employed</u> as a matter of law." <u>Maj. op.</u> at 6 (emphasis added). Such a view is not only at odds with Congress's unambiguous intent, as articulated in the legislative history, but with every court that has considered IRCA's effect on federal labor laws. <u>See NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc.</u>, 134

---

**3** The above three arguments are more fully set forth in my opinion for the panel in this case. <u>See Egbuna v. Time-Life Libraries, Inc.</u>, 95 F.3d 353 (4th Cir. 1996), <u>vacated</u> (Dec. 17, 1996).

F.3d 50, 56 (2d Cir. 1997) (NLRA applies to undocumented aliens); Del Rey Tortilleria, Inc. v. NLRB, 976 F.2d 1115, 1121 (7th Cir. 1992) (NLRA applies to undocumented aliens); Patel, 846 F.2d at 704-05 (FLSA applies to undocumented aliens); EEOC v. Tortilleria "La Mejor", 758 F. Supp. 585, 590-91 (E.D. Cal. 1991) (Title VII applies to undocumented aliens).**4**

The majority's decision is contrary to the unambiguous intent of Congress in IRCA as revealed in the legislative history, the anti-discrimination aims of Title VII, the immigration policy Congress sought to advance through IRCA, and the unanimous caselaw from our sister circuits. For these reasons, I respectfully dissent. I am authorized to state that Judges Murnaghan, Michael, and Motz join in this dissent.

_____

**4** While these cases disagree about the remedies that might be available to an undocumented alien, in particular whether IRCA forbids a backpay award, compare A.P.R.A. Fuel Oil, 134 F.2d at 56-58 (awarding back-pay), with Del Rey, 976 F.2d at 1121-22 (refusing to award backpay), all these cases agree that undocumented aliens' right to proceed under federal labor and anti-discrimination laws survives IRCA.

11